**2024 UT App 54**

# THE UTAH COURT OF APPEALS

MICHAEL ROBERT TILLEMAN,
Appellant,

*v.*

MICHAL CHRISTINE TILLEMAN,
Appellee.

Opinion
No. 20210637-CA
Filed April 11, 2024

Fourth District Court, Provo Department
The Honorable M. James Brady
No. 164402522

Julie J. Nelson, Attorney for Appellant

Douglas B. Thayer, Andy V. Wright, and
Jessica Griffin Anderson, Attorneys for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1     Michael Robert Tilleman (Father) and Michal Christine
Tilleman (Mother) were married and share one child (Child).
Following rather contentious divorce proceedings, the trial court
awarded sole legal custody of Child to Mother but awarded the
parties joint physical custody. The court also imputed federal
minimum wage income to Mother for child support purposes,
and it awarded her attorney fees and costs.

¶2     On appeal, Father makes various arguments challenging
the court's legal custody award. He also contends that the court
abused its discretion in imputing federal minimum wage income
to Mother and in awarding her attorney fees and costs. Although

we affirm several aspects of the court's legal custody award, we nevertheless hold that the court abused its discretion in applying the wrong legal standard and accordingly reverse and remand for the court's consideration of all the statutorily mandated custody factors. We also reverse the court's imputation of Mother's income and its attorney fee award and remand for further proceedings.

BACKGROUND[1]

¶3    Mother and Father married in 2013, and Child was born a little over a year later. In 2016, following a separation, Father filed a petition for divorce. This was soon followed by Mother's counter-petition for divorce. The trial court characterized the ensuing litigation as "contentious" and the parties as "unusually accusatory, intransigent, and uncooperative." We limit our recounting of the divorce proceedings to facts relevant to the issues raised on appeal.

¶4    In 2018, the court entered a stipulated, bifurcated decree of divorce reserving for trial, in relevant part, the issues of custody, parent-time, child support, and attorney fees. Although the parties each initially sought sole physical custody and joint legal custody of Child, by the time of trial they had each amended their pleadings to request sole physical and sole legal custody of Child.

¶5    In conjunction with her counter-petition for divorce, Mother also filed a motion asking that the court order Father to undergo a psychological examination under rule 35 of the Utah Rules of Civil Procedure "to properly address his ability to

---

1. "On appeal from a bench trial, we view the evidence in a light most favorable to the trial court's findings, and therefore recite the facts consistent with that standard." *Chesley v. Chesley*, 2017 UT App 127, ¶ 2 n.2, 402 P.3d 65 (quotation simplified).

parent" Child.[2] The motion alleged that Father "has exhibited intense anger toward [Mother] and has engaged in mental and emotional abuse," that "such anger has been exhibited toward" Child, and that he "may be suffering from mental health conditions."

¶6     Father opposed Mother's rule 35 motion and denied its allegations. In turn, he asked the court to order that Mother undergo a rule 35 evaluation, alleging that she "has been verbally and physically abusive towards" him, that she "is unable to control her anger and aggressions towards" him, and that "recent irrational and inappropriate actions, behaviors, and instability indicate that she may be suffering from some form of mental illness."

¶7     In 2017, at a hearing on temporary orders, Mother's counsel informed the trial court that the parties had stipulated, among other things, "that either party can request and . . . the other party will participate in a Rule 35 mental health exam as long as the requesting party pays the cost up front." Accordingly, the court's temporary order included a provision stating that "[e]ither party may request the other party to participate in [a] Rule 35 examination at the requesting party's expense."

---

2. As relevant here, rule 35(a) of the Utah Rules of Civil Procedure states,

> When the mental or physical condition or attribute of a party or of a person in the custody or control of a party is in controversy, the court may order the party to submit to a physical or mental examination by a suitably licensed or certified examiner or to produce for examination the person in the party's custody or control. The order may be made only on motion for good cause shown.

¶8 Mother subsequently provided Father with a list of three potential rule 35 evaluators, of which Father selected one (First Expert) to conduct his exam. When First Expert requested that Father sign medical releases for his psychological health records, Father refused. In response, Mother filed a motion requesting that the court order Father "to sign and execute all necessary medical releases, upon presentation by [First Expert], so that [Father's] Rule 35 mental examination can proceed as expeditiously as possible." At a hearing before a commissioner on the matter, Father argued that he never agreed to sign medical releases and that his understanding of the stipulation was "that he was agreeing to an independent, objective, standardized psychological test." He also argued that releasing his medical records "prejudices him down the road" because "it allows information that would not otherwise be admissible to become admissible."

¶9 In ruling on the motion, the commissioner first stated that because the trial court—and not a jury—would be the finder of fact in this case, he did not consider prejudice "to be a significant issue." Next, in addressing the scope of the rule 35 exam, the commissioner stated that based on his decades of experience interacting with mental health professionals, "the one thing that they all assure me is true [is that] the best predicter of future behavior is past behavior." The commissioner also noted that the parties had not submitted affidavits from professionals indicating what their usual practice is for such evaluations. Thus, the commissioner recommended, "If it is the Rule 35 examiner's professional opinion that certain information would assist him in completing his evaluation/report, then both parties shall cooperate in good faith and sign whatever releases for records or information the evaluator wants[.]" Father objected to the commissioner's recommendation, but the trial court overruled his objection and ordered him to sign the requested medical releases.

¶10 Upon completion of the rule 35 evaluation, First Expert reached the following conclusions, as summarized by the trial court. First Expert noted that "Father was so guarded and defensive when he took the psychological testing that credible information from testing is not available." First Expert did not observe Father with Child as part of the evaluation. Nevertheless, First Expert concluded, among other things, that Father exhibited "varying degrees" of several negative personality traits; that he "is a very persistent person," which when "utilized to intimidate and control others" can cause substantial harm to himself and others; and that he "tends to place his own interests before those of others and is not invested in cooperative relationships." *See also infra* note 5. First Expert also recommended against joint legal custody of Child.

¶11 In anticipation of trial, Father filed a motion in limine to exclude First Expert's testimony, contending that his "report and his corresponding testimony have not been shown by [Mother] to be reliable, based on sufficient facts or data, and reliably applied to the facts as required by rule 702 of the Utah Rules of Evidence." *See* Utah R. Evid. 702(b). In support of his motion, Father included a report from his own expert (Second Expert) who reviewed the rule 35 evaluation. Second Expert opined, among other things, that "the methodology employed" by First Expert "did not comport with generally accepted standards of practice." He further stated that First Expert's "recommendation against joint legal custody is concerning because there is no indication the purpose of the evaluation was to aid the Court in determining custody."

¶12 Following a hearing, the court ruled that First Expert would be permitted to testify at trial because his "report and his . . . procedures, his methodology, and his data gathering and his qualifications meet that low threshold of showing an indicia of reliability." But because First Expert's "qualifications and methodology don't meet the requirements for a custody

evaluation," the court limited his testimony by precluding him from offering his opinion on that subject at trial.

¶13    Toward the end of 2020, the court held a ten-day bench trial, after which it entered thirty-three pages of findings of fact and conclusions of law. In addressing custody, the court prefaced its findings by discussing Utah Code sections 30-3-10(2) and 30-3-10.2(2), which govern child custody determinations. Section 30-3-10(2) states, with our emphasis, that "[i]n determining any form of custody and parent-time . . . , the court *shall* consider the best interest of the child and *may* consider among other factors the court finds relevant, the following for each parent" and then lists various factors. The court interpreted that section to mean that it "is not required to make findings on all factors listed in" that section. Further, section 30-3-10.2(2) provides, again with our emphasis, that "[i]n determining whether the best interest of a child will be served by ordering joint legal custody or joint physical custody or both, the court *shall* consider the custody factors in Section 30-3-10 and" additional factors listed in section 30-3-10.2(2). The court stated that it understood the interplay between the two sections to mean that when considering joint legal or physical custody of a child, it is "obligated to address the enumerated factors in" section 30-3-10.2(2), but that its consideration of each factor listed in section 30-3-10(2) is not mandatory.

¶14    The trial court then proceeded to make extensive findings pertaining to custody and parent-time, as summarized below. The court found that "[a] primary condition that permeated the marriage was Father's underlying hostility," which also "affected the first few years of [Child's] life and [Father's] early relationship with, and care for" Child. Throughout Child's life, Mother has been Child's primary caregiver. Although "Father rarely, if ever, held, fed, changed, or played with" Child during the marriage, since the separation he has cared for Child during his parent-time. Father and Mother have "demonstrated a strong desire for

parent-time since their separation," and Father "has rearranged work schedules and career goals to accommodate as much time as possible with" Child. His interactions with Child have "significantly improved," and he "has bonded more with her." But his "anger towards Mother occasionally interferes with his ability to see, understand, and meet the needs of" Child. Child "has a strong bond with Father" and "enjoys spending time with" him.

¶15    The court found that Mother consistently demonstrated the ability to meet Child's developmental needs and that Father had demonstrated an improvement in his ability to do so, although the court was unsure whether this was a long-term change. Each parent was able to meet Child's physical needs and to function as an effective parent, although Father's "apparent lack of insight of how his anger towards Mother, and his efforts to embroil Mother in allegations of abuse," *see infra* ¶ 17, "have physically impacted" Child and have interfered with his parenting abilities. The court determined that both parents have negatively impacted Child's emotional wellbeing—albeit Mother to a lesser extent—through their poor responses and behaviors when in each other's presence.

¶16    The court found that although "each parent has shown that they have the capacity and willingness to function as a parent to" Child, "[t]he difficulty lies in their inability to co-parent and properly interact with the other parent," particularly during drop-off and pick-up, as well as when communicating about Child. Regarding drop-off and pick-up, the court stated that "[t]he difficulty comes about by actions of both parents, although Father more consistently causes [Child's] transitions to be difficult" by not encouraging her to transition to Mother's care and by saying things that "weigh negatively on [Child's] emotions in a manipulative and passive aggressive manner." Mother also occasionally expressed displeasure about Father's behavior in Child's presence. Concerning the parents' communication, the

court stated that in 2017, "[d]ue to the high level o[f] conflict," it ordered Mother and Father to communicate through a third-party service that reviewed and, if necessary, edited and revised the messages they sent each other. The third-party service had to make substantial edits to many of Father's messages and advised him that it would "not send emails that are threatening." Because Father also became adversarial with the third-party service, it withdrew, and the parties had to find another communication intermediary. But in the months leading up to trial, communication between the parties had "been relatively civil."

¶17 The court next expressed concern regarding Father's "emotional and sometimes indirect physical abuse of" Child through his repeated claims, "without sufficient justification," that Mother was physically abusive toward Child. Specifically, between 2017 and 2020, Father made multiple reports of abuse to various police departments, the Division of Child and Family Services (DCFS), and medical providers. This "exposed [Child] to unnecessary emotional trauma and invasive physical examinations" and never resulted in criminal charges being filed against Mother or in DCFS taking enforcement action against her. "When the agencies did not confirm his opinion, [F]ather became overly focused, argumentative, and belligerent" and "was unwilling to accept the many conclusions of DCFS." The court found that "Father's reports of abuse were vexatious and were calculated and designed to harm Mother," and he either "was not aware of, or did not care about the emotional harm he was causing [Child] through the continuous filing of unsupported claims of abuse."

¶18 The court then addressed Father's rule 35 evaluation.[3] At trial, First Expert, Second Expert, and another expert (Third Expert) testified about the evaluation. The court noted that based

---

3. Mother also underwent a rule 35 examination, but it does not appear that those results were admitted into evidence at trial.

on First Expert's own testimony, it appeared that First Expert "primarily identified personality traits of [Father] from testing which [First Expert himself] considered invalid." The court also agreed with many of Second Expert's critiques of First Expert's opinions, including that First Expert's "opinions based on testing should not be considered" because First Expert "testified that the test results were unreliable due to Father's high degree of defensiveness"; that First Expert "did not utilize many of the standard tests and methods for determining parenting capacity and therefore his opinions on parenting capacity are not helpful"; and that First Expert did not observe Father interact with Child. Accordingly, the court "found little value in much of [First Expert's] diagnostic expert opinions,"[4] but it noted that, based on other trial testimony and on its own review of some of the records that First Expert examined that were also submitted into evidence, it agreed with his conclusions regarding Father's negative characteristics and personality traits. Specifically, the court noted Father's "historical demonstration of grandiosity, entitlement, interpersonal exploitativeness, lack of empathy, high levels of persistence, rigidity, lack of agreeableness, vexatious intimidation, along with a tendency to resort to arrogant and intimidating behaviors toward others, particularly when encountering others whom he believes stand in his way." The court, however, rejected several of First Expert's other opinions.[5]

---

4. The trial court initially found First Expert "to be credible although not entirely unbiased." But following Father's post-trial motion, the court did not include that statement in the amended findings of fact and conclusions of law that it later issued.

5. Specifically, the court rejected First Expert's opinion that Father "is prone to bouts of depression"; that he "appears to have a disconnect between his emotions and his cognitive abilities,

(continued…)

¶19 The court also found Third Expert to be "qualified," "credible," and "an unbiased witness." Third Expert testified that in counseling sessions, he "worked with Father to understand how to modify his behavior" and that Father had demonstrated improvement. Third Expert described Father's current character traits as "[p]ersistent," "[i]ntelligent," "[e]ven keeled," "[c]onstant in demeanor," and "[a]ble to rise and process issues and disagreement more effectively."

¶20 Turning to the question of legal custody, the court held that the presumption that joint legal custody is in the child's best interest was rebutted in this case by the parties' inability "to set aside their personal differences and focus on the needs of" Child, and it awarded sole legal custody to Mother. The court based this decision on several things: the difficulties the parties had in setting aside their personal differences to attend to Child's needs, although it noted that Mother was better able to do so; Father's emotional abuse of Child "by subjecting her to repeated interviews and physical examinations when he repeatedly raises allegations of abuse against Mother without sufficient cause"; "Father's need to control and dominate Mother" and to disrespect her; Father's "inability to recognize the value of input from others, including Mother"; Father's history of being unable to effectively communicate with Mother; Father's aggressive and passive-aggressive behavior during pick-up and drop-off and his failure to make it a less emotionally draining experience for Child; Father's lack of encouragement that Child "equally share time, love and affection with Mother"; and Mother's constant meaningful participation in raising Child, while Father did not do

---

which impedes his ability to utilize constructive feedback and an inability to learn from his experience and mistakes"; and that "[i]t is likely that Father has not emotionally separated, or moved on from his relationship with Mother."

so for the first few years of Child's life due to "his anger issues" and university studies.

¶21 Regarding physical custody, the court determined that it was in Child's best interest "that Father be actively involved in her life" and that he "should have frequent and consistent time with" her so long as there were orders in place enforcing respectful communication between Mother and Father and reducing their interactions during pick-up and drop-off. Accordingly, the court awarded the parties joint physical custody, with Mother as the primary physical custodian and with Father having "frequent and expanded rights of parent time."

¶22 The court then considered child support, the main issue of which was the income to be imputed to Mother. The court noted that Mother had left full-time employment when Child was born and that she was not employed at the time of trial, but she was attending university classes. The court found that Mother had the experience and skills to find employment in the fields of marketing and public relations with a likely starting income of between $2,500 and $2,800 per month. But the court also found that as a result, Mother would necessarily incur childcare costs and either have to terminate or significantly modify her studies. Ultimately, the court determined that Mother was voluntarily underemployed. But because there was insufficient evidence presented regarding childcare costs or whether current employment was "available in either of her experience categories, or what the current rate of pay would be,"[6] the court imputed to

_____

6. A vocational expert, whom the court found to be "qualified and credible," opined at trial that Mother could earn "approximately $2,800 to $3,750 gross per month" as a public relations specialist. But the court stated that the expert's calculations did not take the COVID-19 pandemic's impact on the job market into consideration, and although the expert provided a projection of

(continued…)

Mother "the federal minimum wage of $1,257 per month." And based on Father's actual income and Mother's imputed income, the court ordered Father to make $666 monthly child support payments to Mother.

¶23    Finally, the court awarded Mother $161,066.94 in attorney fees and costs pursuant to Utah Code section 30-3-3, holding that Mother had substantially prevailed and finding, among other things, that Father had a greater ability to pay.[7]

¶24    Father appeals.

ISSUES AND STANDARDS OF REVIEW

¶25    Father raises five primary issues on appeal. First, Father argues that the trial court erred in awarding sole legal custody of Child to Mother.[8] Specifically, he contends that the "court's analysis of Utah Code sections 30-3-10 and 30-3-10.2 does not comply with Utah law." Generally, we review a trial court's custody award for an abuse of discretion. *See T.W. v. S.A.*, 2021 UT App 132, ¶ 15, 504 P.3d 163. "This discretion is broad; indeed, as long as the court exercises it within the confines of the legal standards we have set, and the facts and reasons for the decision are set forth fully in appropriate findings and conclusions, we will not disturb the resulting award." *Id.* (quotation simplified). But whether the court correctly interpreted the legal standards set

---

future job openings in the field, he did not identify any current job openings or pay rates.

7. We recount the relevant details of the trial court's attorney fees award in Part V.

8. Father does not challenge the trial court's physical custody award on appeal.

forth in sections 30-3-10 and 30-3-10.2 is a question of law that we review for correctness. *See Ross v. Ross*, 2019 UT App 104, ¶ 8, 447 P.3d 104. *See also State v. De La Rosa*, 2019 UT App 110, ¶ 4, 445 P.3d 955 (stating that because "trial courts do not have discretion to misapply the law," "the abuse-of-discretion standard of review will at times necessarily include review to ensure that no mistakes of law affected a lower court's use of its discretion") (quotation simplified).

¶26 Second, Father contends that the court abused its discretion when it found that he had emotionally abused Child. We review the trial court's findings of fact for clear error. *See T.W.*, 2021 UT App 132, ¶ 15. Under this standard, "the factual findings of the district court will not be disturbed unless they are clearly erroneous by being in conflict with the clear weight of the evidence. But the existence of conflicting evidence is not sufficient to set aside a district court's finding." *Hinds v. Hinds-Holm*, 2022 UT App 13, ¶ 28 n.4, 505 P.3d 1136 (quotation simplified).

¶27 Third, Father argues that the trial court erred in allowing First Expert to testify at trial.[9] In reviewing the admissibility of evidence, we review the underlying legal questions for correctness and the "court's decision to admit or exclude evidence and [its] determinations regarding the admissibility of expert testimony" for an abuse of discretion. *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 41, 513 P.3d 729 (quotation simplified). "However, error in the district court's evidentiary

---

9. Father also contends that the trial court erred in ordering him to sign medical releases for his mental health records without first undertaking the analysis set forth in *Debry v. Goates*, 2000 UT App 58, 999 P.2d 582, *cert. denied*, 9 P.3d 170 (Utah 2000). *See id.* ¶ 26. But because Father did not raise this issue below, and instead opposed the release of the records only on prejudice and scope-of-the-stipulation grounds, this argument is not preserved, and we do not address it further.

rulings will result in reversal only if the error is harmful." *Anderson v. Larry H. Miller Commc'ns Corp.*, 2015 UT App 134, ¶ 17, 351 P.3d 832.

¶28 Fourth, Father challenges the court's imputation of federal minimum wage income to Mother for child support purposes. "We review the district court's interpretation of statutory requirements for correctness" and "the court's ultimate imputation of income . . . for abuse of discretion." *Burggraaf v. Burggraaf*, 2019 UT App 195, ¶ 23, 455 P.3d 1071 (quotation simplified).

¶29 Fifth, Father takes issue with the court's award of attorney fees and costs to Mother under section 30-3-3 of the Utah Code. "We review a district court's decision to award attorney fees pursuant to this statute for an abuse of discretion," *Gardner v. Gardner*, 2019 UT 61, ¶ 16, 452 P.3d 1134, but review its underlying legal conclusions for correctness, *see De La Rosa*, 2019 UT App 110, ¶ 4.

ANALYSIS

I. Legal Custody Factors

¶30 Utah law establishes "a rebuttable presumption that joint legal custody . . . is in the best interest of the child."[10] Utah Code

---

10. The presumption in favor of joint legal custody does not apply in cases that include, among other things, "emotional abuse." Utah Code Ann. § 30-3-10(3)(a) (LexisNexis Supp. 2023). Although the trial court in this case did make several findings regarding emotional abuse, the court nonetheless applied the presumption but found that it was rebutted by the parties' inability "to set aside their personal differences and focus on the needs of" Child.

Ann. § 30-3-10(3) (LexisNexis Supp. 2023). This presumption "may be rebutted by a showing by a preponderance of the evidence that [joint legal custody] is not in the best interest of the child." *Id.* § 30-3-10(4)(b). The Utah Code also provides several factors to aid in the best interest analysis. *See id.* §§ 30-3-10(2), -10.2(2) (2019).

¶31　In challenging the trial court's award of sole legal custody to Mother, Father argues that (A) the court wrongly interpreted Utah Code sections 30-3-10(2) and 30-3-10.2(2) to mean that its consideration of the factors listed in section 10(2) was discretionary; (B) the court's application of the wrong legal standard resulted in its failure to consider certain relevant factors in its custody analysis; and (C) the court "analyzed certain factors only as they related to Father but not to Mother."[11] We address each argument in turn.

A.　Statutory Interpretation

¶32　At issue is the interplay between Utah Code sections 30-3-10(2) and 30-3-10.2(2). Section 10(2) provides that "[i]n determining any form of custody and parent-time . . . , the court *shall* consider the best interest of the child and *may* consider among other factors the court finds relevant, the following for each parent[.]" Utah Code Ann. § 30-3-10(2) (LexisNexis 2019)

---

11. Father also argues that the trial court made unsupported findings concerning Mother's financial stability, Father's involvement in Child's life, and the parties' communications. But because Father has not marshaled the evidence in support of these findings, he has not carried his burden of persuasion. *See Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 15, 508 P.3d 612 ("A party will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal the evidence sufficient to overcome the healthy dose of deference owed to factual findings.") (quotation simplified).

(emphasis added). There then follows a list of factors, (a) through (r), several of which have subparts. *See id.* Taken in isolation, section 10(2) suggests that while the trial court must consider the child's best interest when determining custody, the court has discretion as to which specific factors are appropriate for consideration in making that key determination.

¶33 But when joint legal or physical custody is at issue, section 10.2(2) also comes into play. That section provides that "[i]n determining whether the best interest of a child will be served by ordering joint legal custody or joint physical custody or both, the court *shall* consider the custody factors in Section 30-3-10, *and* the following factors[.]" *Id.* § 30-3-10.2(2) (emphasis added). And here again, a number of factors are then listed, (a) through (i), several of which include subparts. *See id.*

¶34 The parties are at odds on whether, when joint custody is at issue, the court's consideration of the section 10(2) factors is discretionary or mandatory. We agree with Father that, in undertaking any joint custody determination, courts are required to consider, in some fashion, all the section 10(2) factors and all the section 10.2(2) factors.

¶35 "Our primary goal when interpreting a statute is to ascertain the legislature's intent," the best evidence of which "is the plain language of the statute itself." *McKitrick v. Gibson*, 2024 UT 1, ¶ 31, 541 P.3d 949 (quotation simplified). In this pursuit, "where the statute's language marks its reach in clear and unambiguous terms, it is our role to enforce a legislative purpose that matches those terms, not to supplant it with a narrower or broader one." *Id.* (quotation simplified). *See Brindley v. Logan City*, 2023 UT App 46, ¶ 22, 530 P.3d 557 ("When the meaning of a statute can be discerned from its language, no other interpretive tools are needed.") (quotation simplified). Furthermore, to determine legislative intent "when two statutory provisions conflict in their operation, the provision more specific in

application governs over the more general provision." *Taghipour v. Jerez*, 2002 UT 74, ¶ 11, 52 P.3d 1252 (quotation simplified). With this charge, we look to the directives our Legislature mandated regarding determinations of joint custody.

¶36 Section 10(2) provides that when "determining *any form of custody*," the court *may* consider, among other things, the factors listed in that section. Utah Code Ann. § 30-3-10(2) (emphasis added). Section 10.2(2), on the other hand, applies when the court is tasked with "determining whether the best interest of a child will be served by ordering *joint legal custody or joint physical custody or both*." *Id.* § 30-3-10.2(2) (emphasis added). Thus, although both section 10(2) and section 10.2(2) purport to govern custody determinations, because section 10(2) applies more generally to "any form of custody," *id.* § 30-3-10(2), and because section 10.2(2) "is tailored precisely" to address joint custody—the type of custody at issue here—section 10.2(2) is the more specific of the two provisions and thus governs, *see Taghipour*, 2002 UT 74, ¶ 14.

¶37 Therefore, based on the plain language of section 10.2(2) that "the court *shall* consider the custody factors in Section 30-3-10 and" additional factors listed in section 10.2(2), *see* Utah Code Ann. § 30-3-10.2(2) (emphasis added), our Legislature has deemed it necessary to impose additional requirements and heightened sensitivities regarding a court's decision to order joint custody. In simple terms, this means that in cases where joint custody is under consideration, trial courts lose much of their discretion about which factors to consider. In other words, when considering the best interest of the child under section 10.2(2), the court is required to consider all the custody factors identified by both section 10(2) and section 10.2(2). *Cf. Martinez v. Sanchez-Garcia*, 2023 UT App 60, ¶ 21, 532 P.3d 105 (stating that under Utah Code section 30-3-10.4(2), which similarly states that when considering whether modifying a custody order is in the child's best interest, the trial court *shall* consider the factors listed in section 10(2) and section 10.2(2), courts "are statutorily required to consider, at least

in some form, twenty-five enumerated factors, as well as any other relevant factor") (quotation simplified).

¶38   We note, however, that "not all [the section 10(2) and section 10.2(2)] factors are on equal footing, and a district court generally has discretion to determine, based on the facts before it and within the confines set by the appellate courts, where a particular factor falls within the spectrum of relative importance and to accord each factor its appropriate weight." *Id.* ¶ 22 (quotation simplified). "Some factors might not be relevant at all to the family's situation, and others might be only tangentially relevant or will weigh equally in favor of both parents." *Id.* For example, among the other custody factors, section 10(2) indicates that the court must consider "the relative benefit of keeping siblings together." Utah Code Ann. § 30-3-10(2)(o). But in some cases, such as the one currently before us, the child does not have any siblings. In such circumstances, it is obviously unnecessary to analyze this factor because it is inapplicable to the court's ultimate decision, although best practice suggests that the court should at least make a note of the factors it considers inapplicable in a given case. *See Martinez*, 2023 UT App 60, ¶ 22 n.6 ("Even with factors not relevant to the situation or factors that do not move the needle one way or the other, a court is well-served to at least mention those factors in its ruling and briefly indicate that it deems them irrelevant or of equal weight for each party. By mentioning them, even if only to say that they are irrelevant, a court ensures that the parties—and, significantly, a reviewing court—will be able to tell that the court at least considered them.") (quotation simplified).

¶39   In sum, the trial court erred when it interpreted the relevant statutes to mean that its consideration of the section 10.2(2) factors was mandatory, while its consideration of the section 10(2) factors was discretionary. The court was required to consider, at least to some degree, all factors listed under both sections, and its failure to do so constituted an abuse of discretion. But "unless an appellant demonstrates that an error is prejudicial,

it will be deemed harmless and no appellate relief is available." *See Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242 (quotation simplified). We consider this question in conjunction with Father's argument addressed in the next section of this opinion.

## B.     Consideration of All Relevant Factors

¶40     Father argues that the trial court's misinterpretation of the governing statutes resulted in its failure to consider a number of relevant factors. Specifically, he asserts that the court abused its discretion when it did not consider the parent's "ability to provide personal care rather than surrogate care"; "the past conduct and demonstrated moral character of the parent"; and "previous parenting arrangements in which the child has been happy and well-adjusted in the home, school, and community," Utah Code Ann. § 30-3-10(2)(c)(iii), (d), (n) (LexisNexis Supp. 2023), even though he presented evidence at trial relevant to each of these factors.

¶41     As an initial matter, we commend the trial court for providing thirty-three pages of detailed findings in this matter, in which it addressed the majority of the section 10(2) and section 10.2(2) factors. But even given these extensive findings, the court expressly stated that it did not consider certain statutorily mandated factors in making its legal custody determination. Instead, it stated that it would consider the 10(2) factors "if it elects to do so." Furthermore, because at least one of the three factors Father identifies, i.e., each parent's "past conduct and demonstrated moral character," *id.* § 30-3-10(2)(d), carries some weight in the legal custody determination,[12] we cannot say that

---

12. The other two factors, the "ability to provide personal care rather than surrogate care" and the "previous parenting arrangements in which the child has been happy and well-adjusted in the home, school, and community," Utah Code

(continued…)

the court's failure to consider all the section 10(2) factors was harmless.

¶42 We therefore vacate the trial court's legal custody determination and remand the case for consideration of all section 10(2) factors, and for such adjustment in the court's legal custody determination, if any, as may then become appropriate. *See Twitchell v. Twitchell*, 2022 UT App 49, ¶ 25, 509 P.3d 806.

C. Comparative Findings

¶43 A best-interest determination is "based on a number of factors that compare the parenting skills, character, and abilities of both parents in light of a realistic and objective appraisal of the needs of a child." *Woodward v. LaFranca*, 2013 UT App 147, ¶ 22, 305 P.3d 181 (quotation simplified), *cert. denied*, 312 P.3d 619 (Utah 2013), *abrogated on other grounds by Zavala v. Zavala*, 2016 UT App 6, 366 P.3d 422. *See Twitchell*, 2022 UT App 49, ¶ 23 n.4 (noting that a trial court's findings should compare both parents' "relative character, skills, and abilities" and not just that of one parent in particular). In other words, the court is required to undertake a comparative analysis whereby the court must consider the evidence relating to each parent.[13]

---

Ann. § 30-3-10(2)(c)(iii), (n) (LexisNexis Supp. 2023), are more germane to a physical custody rather than to a legal custody determination, and Father conceded as much during oral argument before this court.

13. The case of *Allen v. Allen*, 2014 UT App 27, 319 P.3d 770, provides a good example of how appropriate comparison between the parents works in practice. After considering the applicable factors and concluding that "both parents appeared nearly equally capable of caring for" their child, the district court

(continued…)

¶44 Father argues that the court's comparative analysis and subsequent findings on a number of factors addressed only him and did not adequately compare the evidence as it related to Mother. Specifically, Father asserts that the court failed to make findings relating to Mother's emotional stability, Child's bond with her, her maturity and willingness to protect Child from parental conflict, and her ability to cooperate with Father. *See* Utah Code Ann. § 30-3-10(2)(e), (q) (LexisNexis Supp. 2023); *id.* § 30-3-10.2(2)(g), (h) (2019). Although Father acknowledges that the court made certain findings relating to these factors, he contends that the findings did not account for specific pieces of evidence he identifies on appeal.[14] But the trial court is not

---

in that case determined that, with respect to two factors where the parents were not equally strong, "the stability offered by [the father] outweighed the apparent empathy of [the mother]." *Id.* ¶ 5 (quotation simplified). *See id.* ¶ 12 (holding that given the district court's observation that the parties were "nearly equally capable of caring for" the child and its findings of fact supporting that determination, the court had adequately considered the "character and quality of [the child's] bonds with both parents"). The deciding factors in the district court's view were the father's stability and the mother's immaturity, "with a tendency to put her needs above those of others, including" the child. *Id.* ¶ 10. On appeal, this court concluded that the district court's "discussion of the parties' relative maturity, stability, and ability to care for [the child] constitutes adequate consideration of both parties' 'past conduct and demonstrated moral standards.'" *Id.* ¶ 11 (quoting Utah Code Ann. § 30-3-10(2)(d) (LexisNexis 2013)).

14. On this point, Father contends that our decision in *Twitchell v. Twitchell*, 2022 UT App 49, 509 P.3d 806, requires a trial court to make a finding on all evidence presented by either party. Father misinterprets that decision. In *Twitchell*, we determined that "to

(continued…)

required to recite all evidence presented at trial in its findings of fact; just the evidence that is key to its custody decision. *See Twitchell*, 2022 UT App 49, ¶ 21 (highlighting that "courts are not required to render a global accounting of all evidence presented or to discuss all aspects of a case that might support a contrary ruling" and instead must present sufficiently detailed findings and "include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached") (quotation simplified).

¶45   We address each of the factors Father challenges on appeal and ultimately reject his suggestion that a court's comparative analysis must proceed in a point-by-point, side-by-side comparison of each piece of evidence presented at trial in the context of each custody factor. Overall, the court's comparative analysis in this case was sufficient.

¶46   **Emotional Stability.** Father contends that the court included specific findings regarding his emotional stability but did not include similar findings related to Mother despite evidence he presented at trial reflecting negatively on her in that respect. But Father misinterprets the trial court's charge. The court is required to make only sufficient findings to support its decision. And the trial court is in the best position to weigh the evidence.

---

ensure that the trial court's custody determination, discretionary as it is, is rationally based, it is essential that the court set forth in its findings of fact not only that it finds one parent to be the better person to care for the child, but also the basic facts which show why that ultimate conclusion is justified." *Id.* ¶ 24 (quotation simplified). The premise of *Twitchell* is not that a court must make a specific finding regarding each piece of evidence, but simply that a court must make findings on the "basic facts" that support its ultimate conclusion.

¶47 The court found that each parent had shown "the capacity and willingness to function as a parent" but that they both demonstrated an "inability to co-parent and properly interact with the other parent" and that they had "shown [a] limited ability to communicate effectively about [Child] over the years." The court also found Third Expert to be credible and made findings consistent with his opinion that Father had improved his character traits since the parties' separation. But despite Father's improvement, the court also found that Father "says things to [Child] which weigh negatively on her emotions in a manipulative and passive aggressive manner." Comparatively, the court found that "Mother occasionally expresses her displeasure of Father's behavior openly in front of [Child] either by word or by her actions." Based on its charge to make sufficient findings necessary to support its decision, the trial court's findings are sufficiently comparative as concerns the parties' emotional stability, particularly as concerns the issue of legal custody.

¶48 **Child's Bond with Parent.** Father argues that the court specifically found that Child "has a strong bond with" and "enjoys spending time with" him but made no comparative findings regarding Mother's bond with Child. He further asserts that the court did not consider evidence he presented that Mother and Child have a weak bond. But the court's findings demonstrate that the court at least implicitly considered the strong bond between Child and Mother. The court found that "Mother has been the primary caregiver of [Child] from the time she was born, both during the marriage and after separation" and that although Father seemed uninterested in Child during the marriage, since the separation Father's bond with Child had improved through his beginning to care for her during his parent-time. With the court's recognition that Child's bond with Father had improved and became "strong" as he began to show interest in and to care for Child, which Mother has done from the very beginning of

Child's life, the court sufficiently compared Child's bonds with each parent.

¶49　**Maturity and Willingness to Protect Child.** Father next contends that the court made findings relating to his maturity and willingness to protect Child from parental conflict but did not make such findings relating to Mother. We disagree. The court specifically found that each parent showed an "inability to co-parent and properly interact with the other parent," resulting in difficulty surrounding parenting decisions and custody handoffs. The court also found that Mother "occasionally expresses her displeasure of Father's behavior openly in front of [Child] either by word or by her actions." Similarly, the court found that Father displayed "inappropriate interactions with [Child] and Mother during pickup and drop off," demonstrated an "insistence on addressing speculative and false allegations of abuse at the expense of [Child's] emotional well-being," did not encourage Child to look forward to being with Mother, and "is either unaware of the emotional upset his behavior causes [Child] or he is aware but prefers to upset her." Thus, because the court addressed both parents' interactions on custody handoffs and the like, the court's findings are sufficiently comparative as to the parties' maturity and willingness to protect Child from parental conflict.

¶50　**Ability to Cooperate.** Lastly, Father challenges the court's findings regarding his inability to cooperate with Mother. He does not assert that the court did not make comparative findings regarding Mother's ability to cooperate with him. Instead, Father's argument is limited to asserting that the court's findings on this point did not reflect evidence he presented at trial regarding his cooperation with Mother and her lack of cooperation with him. But, as discussed above, the trial court is not required or expected to make a finding on every bit of evidence presented. The litigation in this matter comprised numerous motion hearings and a ten-day trial with multiple

witnesses, resulting in an appellate record in excess of 6,000 pages. The court made thirty-three pages of specific findings and those findings sufficiently show how the court arrived at its decision.

¶51 For these reasons, while the court did not undertake granular comparisons of each piece of evidence deemed problematic by Father, the court did adequately consider Child's best interest by making appropriate comparisons. From the court's extensive findings, it appears that the court made the difficult decision concerning the best interest of Child, who obviously has two very loving parents. *See Tucker v. Tucker*, 910 P.2d 1209, 1215 (Utah 1996) ("A trial court need not find one parent inadequate before awarding custody to the other.").

¶52 In conclusion, because the court abused its discretion in not considering every factor it was statutorily required to, we remand this matter with instructions that the court reconsider its joint legal custody award in light of all the factors listed in section 10(2) and section 10.2(2), and in particular each parent's "past conduct and demonstrated moral character," Utah Code Ann. § 30-3-10(2)(d), as explained in Part I.B.

## II. Emotional Abuse

¶53 Father argues that the court's finding of his "substantial emotional abuse of [Child] through false allegations" was against the clear weight of the evidence. He primarily asserts that the court did not address the evidence of Child's repeated injuries (cuts, bruises, and welts) that prompted him to alert authorities, and that "Mother presented little to no evidence that Child was [harmed], or even affected by the reports."

¶54 As discussed above, under section 30-3-10.2(2) of the Utah Code, the court must address all the factors included in section 30-3-10(2) and make comparative findings for those factors. This

includes consideration of "evidence of domestic violence, neglect, physical abuse, sexual abuse, or emotional abuse, involving the child, the parent, or a household member of the parent." Utah Code Ann. § 30-3-10(2)(a) (LexisNexis Supp. 2023). Here, the trial court expressed concern about "Father's use of emotional and sometimes indirect physical abuse of [Child] by claiming [Mother] has harmed [Child] without sufficient justification" that "exposed [Child] to unnecessary emotional trauma and invasive physical examinations." The court then provided three pages of findings concerning this factor, including a list of some, but not all, of the reports of physical abuse Father made to the authorities about Mother and their outcomes.[15] But because neither party presented expert testimony at trial to establish or rebut whether Father's many reports amounted to emotional abuse in a diagnostic sense, the court's reference to emotional abuse is properly understood as usage in a more colloquial sense with a rather limited purpose.

¶55   The court limited its findings relating to emotional abuse to its legal custody award. Although emotional abuse resulting in harm to Child would absolutely play a significant role in a physical custody determination, the court made no mention of it when it awarded the parties joint physical custody of Child. Instead, the court concluded that it was in Child's best interest that "Father be actively involved in her life" and "have frequent and consistent time with" her.

¶56   And in addressing legal custody, the court discussed its emotional abuse findings in the limited context of discussing the issue of Mother and Father being unable "to set aside their personal differences and focus on the needs of" Child, which

---

15. The trial court acknowledged that its list was not a comprehensive one. Mother asserts that she presented evidence at trial that Father instigated a total of 28 investigations against her.

formed the basis for the court's determination that the presumption in favor of joint legal custody had been rebutted. The court awarded Mother sole legal custody because she was better able to set aside her differences, while "Father is not able to set aside his differences with Mother to give first priority to the welfare of [Child] and reach shared decisions in [Child's] best interests." Father's "subjecting [Child] to repeated interviews and physical examinations when he repeatedly raises allegations of abuse against Mother without sufficient cause" was one such example of this.

¶57    Also notable is that the trial court applied the statutory presumption in favor of joint custody in its analysis (holding that it had been rebutted) when such a presumption does not apply in cases involving emotional abuse. *See id.* § 30-3-10(3)(a) (stating that the presumption in favor of joint legal custody does not apply in cases involving, among other things, "emotional abuse"). This further illustrates the very limited purpose for which the court applied its findings on "emotional abuse," focusing on how it reflected that Father's hostility toward Mother was paramount even if it entailed exposing Child to repeated interviews and physical exams—and not on any harm Child actually suffered as a result.

¶58    With this limited view in mind, we conclude that the court's findings were sufficiently supported by the evidence. Even in light of all the evidence Father presented at trial supporting the various cuts, bumps, and bruises that prompted him to alert authorities, the court's finding that his "reports of abuse were vexatious and were calculated and designed to harm Mother" is supported by the sheer number of reports Father made that never resulted in criminal charges being filed against Mother or in DCFS taking enforcement action against her. Several different agencies all investigated Mother and each investigation produced the same result. Although, as Father points out, they could not conclusively rule out the possibility that Mother abused

Child, the many investigations did not produce sufficient evidence of abuse to cause intervention by the authorities. After multiple reports of such injuries to various authorities and medical professionals did not produce the desired intervention, it was not unreasonable for the court to find that Father's primary motivation in continuing to file such reports was his desire to harm Mother.[16]

¶59    For these reasons, and given the limited role the court's findings related to "emotional abuse" served in the legal custody analysis, we do not disturb those findings.

### III. First Expert's Testimony

¶60    Father argues that the trial court abused its discretion in not excluding First Expert's testimony as unreliable under rule 702 of the Utah Rules of Evidence. In support of this argument, he points to the court's ultimate agreement with Second Expert's testimony that, among other things, First Expert's "opinions based on testing should not be considered" and that First Expert "did not utilize many of the standard tests and methods for

---

16. In any event, although Father argues that the trial court's findings are against the clear weight of the evidence given the evidence of Child's various injuries presented at trial, he has not marshaled the evidence supporting the court's findings. To successfully challenge a finding, it is not enough to focus only on "evidence that points to an alternate finding or a finding contrary to the trial court's finding of fact." *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (quotation simplified). Accordingly, Father has also not carried his burden of persuasion on appeal. *See Pankhurst v. Pankhurst*, 2022 UT App 36, ¶ 15, 508 P.3d 612 ("A party will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal the evidence sufficient to overcome the healthy dose of deference owed to factual findings.") (quotation simplified).

determining parenting capacity and therefore his opinions on parenting capacity are not helpful." But even assuming, without deciding, that the court's decision to allow First Expert to testify amounted to an abuse of discretion, such error was harmless here.

¶61   "Not every trial error requires reversal." *State v. Leech*, 2020 UT App 116, ¶ 42, 473 P.3d 218 (quotation simplified), *cert. denied*, 481 P.3d 1039 (Utah 2021). "Unless an appellant demonstrates that an error is prejudicial, it will be deemed harmless and no appellate relief is available." *Huish v. Munro*, 2008 UT App 283, ¶ 8, 191 P.3d 1242 (quotation simplified). "An error is harmless and does not require reversal if it is sufficiently inconsequential that we conclude there is no reasonable likelihood that the error affected the outcome of the proceedings." *State v. Reece*, 2015 UT 45, ¶ 33, 349 P.3d 712 (quotation simplified).

¶62   Here, after agreeing with several of Second Expert's concerns and critiques of First Expert's rule 35 evaluation of Father, the court stated that it ultimately "found little value in much of his diagnostic expert opinion" and that it agreed with only some of his "conclusions regarding characteristics and personality traits" of Father. But even here, the court stated that First Expert's opinions with which it agreed "are consistent with other evidence presented to the Court regarding Father's historical demonstration of" certain negative personality traits, specifically records submitted into evidence and other trial testimony. Thus, First Expert's testimony did not serve as the sole basis for the court's findings regarding some of Father's characteristics and personality traits. Indeed, the court seemed to emphasize that its agreement with First Expert in that regard was based on the corroboration furnished by the court's own review of some of the records First Expert examined and on other trial testimony.

¶63   For these reasons, Father has not demonstrated a reasonable likelihood that First Expert's testimony affected the outcome of the trial, and this argument therefore fails.

IV. Mother's Imputed Income

¶64   Father contends that the court abused its discretion by imputing Mother's income at only the federal minimum wage, when a higher income was in order given the evidence before the court. Because the trial court misapplied the controlling legal standard, we agree.

¶65   "Because income imputation itself is primarily focused on a spouse's ability to produce income, it is not unusual for courts to impute income to a spouse who has not worked during the marriage (or who has not worked for a number of years preceding the divorce) but who is nevertheless capable of producing income." *Petrzelka v. Goodwin*, 2020 UT App 34, ¶ 26, 461 P.3d 1134 (quotation simplified). "The purpose of such imputation is to prevent parents from reducing their child support or alimony by purposeful unemployment or underemployment." *Connell v. Connell*, 2010 UT App 139, ¶ 16, 233 P.3d 836 (quotation simplified).

¶66   Section 78B-12-203 of the Utah Code establishes the guidelines by which income may be imputed. It provides that in contested cases, a trial court may not impute income to a party without first holding a hearing on the matter and entering "findings of fact as to the evidentiary basis for the imputation." Utah Code Ann. § 78B-12-203(8)(a) (LexisNexis 2022). The statute further provides that the court's imputation of income "shall" be based on the following ten factors, "to the extent known": "(i) employment opportunities; (ii) work history; (iii) occupation qualifications; (iv) educational attainment; (v) literacy; (vi) age; (vii) health; (viii) criminal record; (ix) other employment barriers and background factors; and (x) prevailing earnings and job

availability for persons of similar backgrounds in the community."[17] *Id.* § 78B-12-203(8)(b).

¶67   Here, the trial court deemed Mother voluntarily underemployed and found that she "has experience and skills in the workforce that would enable her to find employment in marketing and public relations work." The court further found that "[i]f Mother were able to find employment as either a PR Specialist or in Advertising Sales her likely income would start around $2,500 to $2,800" per month. But the court opined that to become employed full-time, "Mother would necessarily incur childcare costs for a six (6) year old with transportation to and from school and would need to terminate or significantly modify her current study program" and that the evidence presented at trial "does not provide a calculation of the costs of day care expense necessary for Mother to become full time employed." The court further stated that "the evidence provided is insufficient for the Court to determine that there is current employment available in either of her experience categories, or what the current rate of pay would be," presumably given the impact of the COVID-19 pandemic. Based on those considerations, the court imputed to Mother "the federal minimum wage of $1,257 per month."

---

17. The statute further provides that in cases where "a parent has no recent work history," a court may impute "an income at the federal minimum wage for a 40-hour work week," and that "[t]o impute a greater or lesser income, the judge in a judicial proceeding . . . shall enter specific findings of fact as to the evidentiary basis for the imputation." Utah Code Ann. § 78B-12-203(8)(c) (LexisNexis 2022). Although Mother was not working at the time of trial, this did not form the basis for the trial court's decision to impute the federal minimum wage to her. Rather, it found that she had the potential of earning between $2,500 and $2,800 per month but reduced this amount based on other factors as explained in paragraph 67.

¶68　The court's reasons for reducing Mother's imputed income from between $2,500 and $2,800 per month to the federal minimum wage go against the legal standard set forth in section 78B-12-203. As an initial matter, the reasoning that Mother would need to make adjustments to her schooling in order to pursue full-time employment has no legal basis. "[T]he pursuit of a higher education simply does not preclude employment." *Mancil v. Smith*, 2000 UT App 378, ¶ 17, 18 P.3d 509. Although section 78B-12-203 provides that a trial court may not impute an income to a parent who "is engaged in career or occupational training to establish basic job skills" when such training "is not of a temporary nature," Utah Code Ann. § 78B-12-203(8)(d)(iii), this is not the case here. Mother already had a bachelor's degree and was pursuing a graduate program. Moreover, the court already found that she possessed skills and experience in the field of marketing and public relations. *See Fish v. Fish*, 2010 UT App 292, ¶ 18, 242 P.3d 787 ("The basic job skills training envisioned by the statute is training which can aid a person in achieving an income beyond the minimum wage job which can be had with no training at all, i.e., training for the starting point on a consecutive progressive career track.") (quotation simplified). Thus, the court incorrectly based its reduction in Mother's imputed income on her pursuit of higher education.

¶69　As for daycare expenses, at age six, Child would begin school soon, thus drastically reducing childcare costs as well. In any event, Utah law provides that "[t]he child support order shall require that each parent share equally the reasonable work-related child care expenses of the parents." *See* Utah Code Ann. § 78B-12-214(1) (LexisNexis 2022). Accordingly, the child support order—and not Mother's imputed income—was the appropriate means by which to address childcare costs.

¶70　Lastly, section 78B-12-203(8) mandates that the trial court base its imputation of income on "employment potential and probable earnings" by evaluating the ten enumerated factors, "*to*

*the extent known.*" *Id.* § 78B-12-203(8)(b) (emphasis added). The statute thus expressly provides for possible uncertainty regarding the factors. Here, the vocational expert, whom the trial court found to be "qualified and credible," provided a projection of future job openings in the field and stated that the unemployment rate in the area had doubled from the previous year due to the COVID-19 pandemic. Insofar as the court felt that additional information regarding current employment opportunities in the area was necessary, the uncertainty regarding this factor did not support a reduction of the already determined likely beginning wage of between $2,500 and $2,800 per month to the federal minimum wage. To be sure, the trial court has discretion when weighing the statutory factors, but because the statute expressly allows for uncertainty regarding the factors, that uncertainty cannot rationalize the court's somewhat speculative decision.

¶71    For these reasons, the trial court abused its discretion by applying the wrong legal standard when imputing Mother's income. *See T.W. v. S.A.*, 2021 UT App 132, ¶ 15, 504 P.3d 163. We therefore reverse the trial court's imputation of federal minimum wage income to Mother and remand for recalculation of her imputed income consistent with this opinion.

## V. Attorney Fees and Costs

¶72    Finally, Father contends that in awarding attorney fees and costs to Mother, the trial court misapplied Utah law by incorrectly applying the "substantially prevailed" standard and by basing its decision, in part, on Father's greater ability to pay. We agree.

¶73    A trial court may award attorney fees in a divorce action pursuant to section 30-3-3 of the Utah Code. "Both the decision to award attorney fees and the amount of such fees are within the district court's sound discretion." *Lobendahn v. Lobendahn*, 2023 UT App 137, ¶ 44, 540 P.3d 727 (quotation simplified). But the court must still "make detailed findings of fact supporting its

determination." *Connell v. Connell*, 2010 UT App 139, ¶ 27, 233 P.3d 836.

¶74   Section 30-3-3 "creates two classes of attorney fees—those incurred in *establishing* court orders and those incurred in *enforcing* court orders." *Id.* ¶ 28 (emphasis in original). Subsection (1) provides,

> In any action . . . to *establish* an order of custody, parent-time, child support, alimony, or division of property in a domestic case, the court may order a party to pay the costs, attorney fees, and witness fees, including expert witness fees, of the other party to enable the other party to prosecute or defend the action. The order may include provision for costs of the action.

Utah Code Ann. § 30-3-3(1) (LexisNexis Supp. 2023) (emphasis added). "[T]he party to be awarded attorney fees under this [subsection] has the burden to prove (1) that the payee spouse has a financial need, (2) that the payor spouse has the ability to pay, and (3) that the fees requested are reasonable." *Lobendahn*, 2023 UT App 137, ¶ 44.

¶75   Subsection (2) provides,

> In any action to *enforce* an order of custody, parent-time, child support, alimony, or division of property in a domestic case, the court may award costs and attorney fees upon determining that the party substantially prevailed upon the claim or defense. The court, in its discretion, may award no fees or limited fees against a party if the court finds the party is impecunious or enters in the record the reason for not awarding fees.

Utah Code Ann. § 30-3-3(2) (emphasis added). In contrast to subsection (1), when "awarding fees under subsection (2), the court may disregard the financial need of the moving party" using the "substantially prevailed" standard as "the guiding factor." *Connell*, 2010 UT App 139, ¶ 28 (quotation simplified).

¶76　The differing standards of the two subsections are attributed to the different purposes each subsection serves. *See id.* ¶ 29. "Attorney fees are granted under subsection (1) to enable a party to prosecute or defend the action." *Id.* (quotation simplified). Otherwise, "a spouse lacking a separate income would be unable to meaningfully participate in divorce proceedings." *Id.* "Consequently, the moving spouse's need is a sine qua non of a subsection (1) award." *Id.* Conversely, "fee awards under subsection (2) serve no equalizing function but allow the moving party to collect fees unnecessarily incurred due to the other party's recalcitrance." *Id.* ¶ 30.

¶77　Here, in addressing the question of attorney fees and costs, the trial court prefaced its findings with the observation that the litigation in this matter "was contentious and relied on a significant amount of documents, which caused a significant amount of fees to be incurred by the parties." The court first denied Father's request for attorney fees "as a sanction for [Mother's] unreasonableness in requiring these proceedings to go to trial," ruling that "[a]ttorney's fees as sanctions are not applied because a party has been unreasonable in requiring disputes to go to trial." The court then turned to Mother's competing request premised on her "having 'substantially prevailed.'" The court stated that Mother "did substantially prevail, not only at trial, but at interim hearings on motions prior to trial."

¶78　Following this preface, the court entered findings regarding the parties' need and ability to pay. The court found that Mother "has limited income, if any, at this time," and it noted Father's annual salary. The court then proceeded to make findings

on the parties' expenses and disposable income, prefacing its findings by stating that it "has limited information regarding each party's monthly expenses." The court found that Father has "approximately $44,500 in disposable funds annually." Turning to Mother next, the court first noted that neither party provided any evidence of her expenses, leaving the court "with no basis to find Mother has any expenses beyond those which are covered by her need for child support."[18] The court thus found that Mother "has no income and no evidence of expenses." The court also noted that "it received no evidence that Mother can pay for her costs and attorney fees." Based on this, the court found that "[a]s between Father and Mother, Father has the greater ability to pay attorney's fees" and held that "Mother should be awarded her reasonable costs and attorney fees."

¶79 The court then addressed the reasonableness of Mother's attorney fees. It again prefaced its findings by stating that "[a]lthough the issues of custody, parent time, and child support are routinely dealt with in our courts, this case is not a 'usual' case" because "[t]he parties have been unusually accusatory, intransigent, and uncooperative which has significantly raised the costs of this litigation to both parties." The court noted that "Father's decisions caused Mother to successfully bring multiple orders to show cause, motions to compel, and statements of discovery issues," and have "forced Mother to incur otherwise unnecessary legal costs." Against this backdrop, the court found

---

18. Father argues that Mother bore the burden of establishing her expenses and that the court incorrectly faulted him for not providing evidence of her expenses. But the inability to establish Mother's expenses only benefitted Father—admittedly to a very limited degree—as the court ultimately did not attribute any expenses to Mother apart from those that are covered by her need for child support in its calculation of disposable funds available to her.

that not all Mother's requested costs and fees, totaling almost $410,000, were "reasonable and necessary," and it ultimately awarded her $161,066.94 in attorney fees and costs. The court largely based this reduction on Mother's "duplication of legal services, unnecessary review and consultation between multiple attorneys, and inefficiencies in presenting evidence at trial," which the court deemed to be unreasonable.

¶80   There are two problems with the trial court's award. First, the court conflated the two distinct bases for awarding fees under section 30-3-3, resulting in an undifferentiated attorney fees award. *See Connell*, 2010 UT App 139, ¶ 31. The court began its analysis by stating that Mother "substantially prevail[ed], not only at trial, but at interim hearings on motions prior to trial."[19] This statement in and of itself is concerning as the purpose of the ten-day bench trial was largely "to establish an order of custody, parent-time, [and] child support," thereby implicating subsection (1). *See* Utah Code Ann. § 30-3-3(1). But subsection (1) does not apply a "substantially prevailed" standard. *See Lobendahn*, 2023 UT App 137, ¶ 44; *Connell*, 2010 UT App 139, ¶ 29.

¶81   Although some pre-trial motions dealt with enforcing the court's temporary orders regarding "custody, parent-time, child support, alimony, or division of property," thereby falling under the ambit of subsection (2), *see* Utah Code Ann. § 30-3-3(2), the court did not distinguish between the two distinct statutory bases for awarding attorney fees. Rather, the court took the total amount of attorney fees Mother sought and reduced the amount to the sum it considered reasonable based on multiple inefficiencies on Mother's part.

---

19. The court awarded some attorney fees to Mother for her success in pre-trial motions along the way. The court also reserved for later determination the issue of attorney fees on certain other pre-trial motions.

¶82 The second problem is that in awarding attorney fees under subsection (1), the court did not expressly find that Father "has the ability to pay" the requested attorney fees. *Lobendahn*, 2023 UT App 137, ¶ 44. Instead, the court found that between the two, "Father has the greater ability to pay attorney's fees." Whether Father is in a better position than Mother to pay attorney fees and whether Father has an actual ability to pay both his and Mother's attorney fees are two different inquiries. Although the answer to both questions may, on remand, end up being the same, the court nonetheless did not make the required finding when awarding Mother attorney fees. *See Connell*, 2010 UT App 139, ¶ 27 (stating that as part of its attorney fees award, the court "must make detailed findings of fact supporting its determination").

¶83 In sum, we reverse the trial court's award of attorney fees and costs and remand with instructions that the court distinguish the fees that fall under subsection (1) and subsection (2) of section 30-3-3, and that it apply the corresponding legal standard to each group of fees. In the course of this effort, the court also needs to make a specific finding regarding Father's ability to pay Mother's attorney fees as to any fees awarded under subsection (1).

CONCLUSION

¶84 There remain issues that require additional attention and must be revisited on remand. Although we affirm certain of the trial court's findings of fact and evidentiary rulings relating to its award of sole legal custody of Child to Mother, we reverse and remand with instructions that the court reevaluate its legal custody award by considering all the statutorily mandated custody factors, in particular the one focused on past conduct and moral character. We likewise reverse and remand for further

consideration of Mother's imputed income and the award of attorney fees and costs in Mother's favor.[20]

---

20. Father recently asked that we take judicial notice of developments in legal proceedings involving other parties that he believes are germane to this case. Mother opposes Father's motion. We are not persuaded that the matters we are asked to take notice of bear on the issues presented in this appeal and so deny the motion. If relevant to the issues the trial court will address on remand, Father may renew his request in that forum.